1
2
3
4
5
6                    IN THE UNITED STATES DISTRICT COURT

7                      FOR THE DISTRICT OF ARIZONA

8

9    Jeremy Daniel Bach,              )    No. CV 09-1914-PHX-JAT (MHB)
                                      )
10            Petitioner,             )    **REPORT AND RECOMMENDATION**
                                      )
11   vs.                              )
                                      )
12   Charles L. Ryan,                 )
                                      )
13            Respondent.             )
                                      )
14   _____)

15

16   TO THE HONORABLE JAMES A. TEILBORG, UNITED STATES DISTRICT JUDGE:

17           Petitioner, represented by counsel, has filed a Petition for Writ of Habeas Corpus

18   pursuant to 28 U.S.C. § 2254 (Doc. 1).  In 1997, Petitioner was convicted by a jury in the

19   Maricopa County Superior Court of second degree murder (Doc. 1, Exh. 1 at 4).  On January

20   16, 1998, Petitioner was sentenced to "an aggravated, maximum, flat term of twenty-two

21   years" (Id.).  Petitioner, who was 13 years of age at the time of the offense, was initially

22   charged in the Juvenile Court division of the Maricopa County Superior Court but was

23   subsequently transferred to adult court where he was tried (Doc. 1 at 11).  On January 21,

24   2010, Respondent filed a Limited Answer to Petition for Writ of Habeas Corpus (Doc. 16).

25   Petitioner filed a Reply to Respondent's Limited Answer April 23, 2010 (Doc. 26).

26           The magistrate judge filed a Report and Recommendation on September 13, 2010

27   (Doc. 30), recommending that the habeas petition be denied because it was untimely under

28   the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  See 28 U.S.C. §

2244(d)(1).  On March 17, 2011, the district court filed an Order (Doc. 34) rejecting the Report and Recommendation and staying the case pending the *en banc* decision in Lee v. Lampert, 610 F.3d 1125 (9th Cir. 2010).  On September 19, 2011, the district court issued an Order (Doc. 38) lifting the stay and re-referring the case to the magistrate judge for the preparation of a new Report and Recommendation in light of the Ninth Circuit's decision in Lee v. Lampert, 653 F.3d 929 (9th Cir. 2011).  The parties have filed supplemental briefing discussing how Lee applies to this case (Docs. 41, 42).  On July 18, 2012, this matter was reassigned, by random draw, to the undersigned.

Petitioner, through counsel, raises four grounds for relief in his Petition for Writ of Habeas Corpus: (1) that he is entitled to relief under the Due Process Clause because no reasonable fact-finder could have found him guilty of second-degree murder or even manslaughter; (2) that imposing the maximum aggravated sentence for an adult against Petitioner, who was thirteen years old at the time of the offense, violated the Cruel and Unusual Punishment Clause of the Eighth Amendment; (3) that Petitioner received ineffective assistance of counsel at trial, in violation of the Sixth Amendment; and (4) that Petitioner received ineffective assistance of counsel on direct appeal, in violation of the Sixth Amendment.

Respondents contend in their Limited Answer that the Petition should be dismissed because it was not filed within the statute of limitations period.  Petitioner concedes that his habeas petition was filed after the limitations period expired, but he argues that the one-year statute of limitations should be overridden by the fact that Petitioner is "actually innocent" of the offense for which he was convicted (Doc. 1 at 90-94).  Respondent has provided briefing in his Limited Answer arguing that Petitioner has not met the criteria of showing actual innocence (Doc. 16 at 65-88).

///

///

///

**BACKGROUND**

The following is a discussion of the evidence admitted at Petitioner's trial. The events surrounding the victim's death were in large part admitted through Petitioner's pretrial statements made to law enforcement officers and others. Other than Petitioner, there were no eyewitnesses to the circumstances involving the shooting death of the victim.

On the morning of Friday, November 10, 1995, pursuant to a planned meeting, Brad Hansen ("Brad"), aged 13, borrowed a neighbor's bicycle and rode to Petitioner's residence. Brad and Petitioner were middle school classmates and their parents were unaware that there was no school that day. Another classmate, Taylor Smith, aged 12, also planned to meet at Petitioner's residence. (Doc. 19, R/T 11/5/97 at 4-5.) Daniel Bach, Petitioner's step-father, left for work at approximately 7:00 a.m., leaving the boys alone at the house. (Doc. 18, R/T 10/29/97 at 76.)

At some point, Petitioner and Brad began playing with Daniel Bach's handguns, including a .357 magnum revolver and a .22 derringer. A handgun fired while Petitioner was holding it and the bullet struck Brad in his chest, hurled him backward, tore through his body, and lodged in the kitchen wall. (Doc. 19, R/T 11/12/97 at 29; Doc. 18, Exh. 35A.) Brad's mother described him as 4-foot, 10 inches tall and weighing approximately 70 pounds. (Doc. 18, R/T 10/28/97 at 62-63.)

Brad allegedly fell to the floor on his side and then rolled over on his back. According to Petitioner's statement to authorities, Brad's eyes were open, his chest was heaving, foam seeped from his mouth, and small pieces, which Petitioner referred to as "heart chunks" and described as looking "like liver," flowed from the chest wound and onto the floor. (Doc. 19, R/T 11/12/97 at 29; Doc. 18, Exh. 35A.) Petitioner told Phoenix Police Detective Stephen Lewis he thought Brad was faking but then knew Brad had been shot and thought, "[o]h shit I killed him." Petitioner tried to sit Brad upright but he kept falling over and was speechless. Petitioner leaned Brad up against the kitchen wall, lifted his shirt and wiped the blood off Brad's stomach with a rag. Petitioner then turned on some music, hid the cigarettes the boys had been smoking, threw the cigarette butts away, and discarded the spent shell-casing. (Id.)

1    According to Petitioner's admitted statements, Petitioner considered telephoning his
2  step-father about the shooting but decided that would be "too stressful." He also thought
3  about calling one of his friends to bring his truck and bury Brad, but decided he could not do
4  that because they would know he had killed Brad, tell the cops, and Petitioner would be
5  arrested. Petitioner did not seek any aid for Brad. Petitioner had Brad's body for about an
6  hour-and-a-half. Brad had rolled over, closed his eyes and was not moving. Petitioner
7  discarded Brad's body in the Bach family trash container in a sitting position but left the lid
8  open in case Brad decided to walk out. An hour later, Petitioner went outside and closed the
9  lid on the trash container. Petitioner spent about two hours cleaning up the blood on the
10  kitchen floor and wall and washed his clothes. He threw Brad's backpack away but allegedly
11  did not dispose of Brad's bicycle. Taylor Smith arrived at the house a few minutes after
12  Petitioner had finished cleaning. (Id.)

13    The following Tuesday was the scheduled trash pick-up date for the Bach household.
14  However, Brad's body remained in the trash bin for more than a week. Petitioner told
15  Phoenix Police Detective Stephen Lewis that he "forgot" to take the trash container out for
16  collection. (Id.)

17    Taylor Smith arrived at Petitioner's residence at approximately 10 or 11 a.m. on
18  November 10. She saw a bike that belonged to Brad's next door neighbor. Petitioner's
19  father was not at home. Taylor testified that Petitioner was "like he had been asleep." She
20  saw Brad's hat and pager on a table in the living room and a bullet casing in the trash next
21  to the couch. According to Taylor's trial testimony, Petitioner told her that Brad had left
22  after the two of them had gotten into a fight, but Taylor thought Petitioner was joking and
23  looked for Brad at the house. Taylor noticed drops of blood on Petitioner's shirt, a stain on
24  the kitchen floor (grout), and a hole in the kitchen wall. Petitioner told her that Brad had hit
25  him in the face with a chair, causing his nose to bleed. Taylor testified that she thought
26  Petitioner had told her that the fight was about a video game they were playing, and during
27  the game, Petitioner had called Taylor "a name" and Brad got upset and left. Petitioner said
28  the stain was ketchup, and told Taylor that a fork had been thrown at the wall and caused the

hole.  Taylor described the stain on the floor as directly under the hole in the wall.  While Taylor was at the house, Petitioner dug what looked like a slug out of the wall and threw it into the kitchen garbage.  Petitioner told her that one of them shot at the other but she could not recall which one was holding the gun and fired it, and Taylor took it as he was just kidding.  Taylor testified that on previous occasions while at the Bach residence, she had seen a gun that was kept in the couch under the cushion and another gun was kept in the kitchen above the phone.  Petitioner had shown her the gun in the couch.  Later, when Taylor returned to Petitioner's residence on the weekend, she noticed that the hole in the kitchen wall appeared to have been covered or patched.  Petitioner gave her other explanations, such as, Brad had left to go to Fry's and he had gone to visit a friend.  (Doc. 19, R/T 11/5/97 at 3-32.)

In the afternoon on November 10, the maids arrived at the Bach residence to clean and noticed spots of blood in the kitchen and dining room.  One of the maids noticed blood on the kitchen wall.  Petitioner told them that he had gotten into a fight at school.  Another one of the maids saw a portion of a pant leg, seemingly filled with something and hard, in the Bach family garbage container outside the residence.  One of the maids confirmed she had seen a gun under a cushion in the living room when she had cleaned on previous occasions.  (Doc. 18, R/T 10/29/97 at 6-22.)

Meanwhile, Brad's mother Rhonda Michie had learned that there was no school that day and paged Brad around 8:00 a.m., but received no response.  Ms. Michie left work at about 2:00 p.m., but found that Brad was not at home.  She telephoned Petitioner who told her that Brad had left his house earlier that day.  Ms. Michie told Petitioner to tell Brad if he was not home by 5:00 p.m., she would call the police.  She also telephoned Daniel Bach and told him that Brad apparently had run away and he did not have permission to spend the night at the Bach residence.  Mr. Bach said he would find out what happened and call her back.  Ms. Michie drove to the homes of several of Brad's friends, including the Bach residence, in an attempt to locate Brad.  Daniel Bach never called Brad's mother to report any explanation.  At approximately 5:05 p.m., Ms. Michie contacted the Phoenix Police

1   Department to report Brad missing.   She continued to look for Brad over the weekend.

2   (Doc. 18, R/T 10/28/97 at 62-76, 86.)

3          On Monday, November 13, 1995, Brad's mother telephoned Daniel Bach and reported

4   a rumor to the effect that Brad had fired a gun, barely missing Petitioner, the bullet had hit

5   a wall, and Brad had a gun and was going to kill himself.  Mr. Bach confirmed through his

6   girlfriend Debbie who was at the residence that no weapons were missing.  In an ensuing

7   phone call arranged by Debbie, Petitioner told Brad's mother that Brad had left the house

8   on his bicycle with his backpack.  Ms. Michie asked Petitioner what Brad's mental state was

9   when he left the residence and Petitioner answered that Brad had said "his life sucked."  On

10  the Wednesday before Thanksgiving, Ms. Michie telephoned Petitioner to ask if he would

11  help distribute flyers about Brad.  Petitioner responded he would have to ask his dad and

12  asked Ms. Michie if he could have his shirts back.  On the Friday after Thanksgiving, Ms.

13  Michie distributed flyers regarding her missing son.  Petitioner did not assist in distributing

14  the flyers.  (Doc. 18, R/T 10/28/97 at 76-81.)

15         While at school on Monday, November 13, Petitioner met twice with Anne Schelling,

16  a school administrator, about Brad's disappearance.  Ms. Schelling, in her testimony, stated

17  that she could not recall the sequence of her conversations regarding what Petitioner had told

18  her.  Petitioner, in the presence of Taylor Smith, told Ms. Schelling that Brad had come to

19  his house on the previous Friday and then left, saying that he would be back in ten minutes

20  but he did not return.  After the first meeting, Ms. Schelling learned about a rumor and she

21  became concerned because there was talk about a gun going off at the Bach residence.  Ms.

22  Schelling talked with Taylor who told her that she had seen some bloody clothes in the

23  washer at the Bach residence, a hole in Petitioner's t-shirt, and some blood.  Ms. Schelling

24  spoke with Petitioner again and he told her that he and Brad had gotten into a fight, Brad hit

25  Petitioner with a bar stool, and then left.  Petitioner denied that a gun had been involved.

26  (Doc. 19, R/T 10/30/97 at 81-87.)  Ms. Schelling telephoned Mr. Bach and reported a rumor

27  about a bullet hole in the wall at his residence.  Mr. Bach denied the existence of any bullet

28  hole and told her no gun play had occurred inside the house.  (Doc. 19, R/T 10/30/97 at 88-

97.)  While in class in mid-November 1995, during a discussion of Edgar Allen Poe's "The Fall of the House of Usher," Petitioner asked his language arts teacher how long it would take a person who had been shot to bleed to death.  (Doc. 19, R/T 10/30/97 at 76-78.)

On or about December 5, 1995, Phoenix Police Officer Lisandro Abril met with Petitioner and Ms. Schelling at the middle school Petitioner attended.  At the time, Officer Abril had no suspicion that a crime had been committed.  Petitioner told Officer Abril that on November 10, 1995, he and Brad had gotten into a fight and Brad beat him up then left to go home for ten minutes, but never came back.  Petitioner also claimed that Brad had thrown a butter knife at him.  When questioned about whether a handgun had been discharged, Petitioner said no gun had been involved and that he had made that story up.  Petitioner told Officer Abril that he thought Brad had gone to Tucson with someone named Popeye or was in California with his father.  (Doc. 19, R/T 11/5/97 at 38-50.)

On December 13, 1995, Daniel Bach spoke by telephone with Phoenix Police Detective Stephen Lewis and reported that he had checked the .357 revolver he kept hidden in his living room and determined that the gun had not been fired.  He also reported that there had been no shooting at his house and there was no bullet hole in the wall.  This discussion occurred in the context of the rumor that a gun had been fired on November 10.  Mr. Bach agreed to let Detective Lewis speak with Petitioner the next day.  (Doc. 19, R/T 11/6/97 at 93, R/T 11/13/97 at 4-7.)

On December 14, 1995, Detective Lewis and Phoenix Police Detective Sallie Dillian met with Petitioner and his step-father at the Bach residence.  Petitioner acknowledged the rumor about a shooting, but maintained that there had been no shooting at the house.  While at the residence, the detectives observed what appeared to be a partially plugged bullet hole in the kitchen wall.  Mr. Bach showed the detectives the .357 magnum and said that he had smelled the gun and it did not appear to have been fired.  (Doc. 18, R/T 10/29/97 at 82-83; Doc. 19, R/T 11/6/97 at 93-98, R/T 11/13/97 at 7-9.)

On December 15, 1995, Daniel Bach telephoned Detective Lewis and requested a meeting at Bach's office.  During the meeting, Bach said that he had spoken with Petitioner

after the previous day's interview and determined that a gun had gone off inside his house and struck the wall.  Bach gave Detective Lewis the slug Petitioner purportedly had removed from the wall and arranged for the detectives to re-interview Petitioner.  (Doc. 18, R/T 10/29/97 at 80-83; Doc. 19, R/T 10/30/97 at 20-26, R/T 11/6/97 at 99-103, R/T 11/13/97 at 10-13.)

On December 15, 1995, Detectives Lewis and Dillian re-interviewed Petitioner at the Bach residence.  Petitioner stated that Brad had fired a gun at him on November 10.  Petitioner showed the detectives how the bullet went right by his shoulder and then lodged in the wall.  Petitioner appeared to realize that the bullet hole was quite lower than where his shoulder would have been when the gun discharged according to his demonstration.  Petitioner paused and then moved his body so his shoulder lined up with the bullet hole.  When asked if the hole the detectives had seen the night before was the hole where the bullet was, "they" confirmed it.  Petitioner told the detectives that he dug the slug out of the wall.  (Doc. 19, R/T 11/6/97 at 113, R/T 11/12/97 at 9-10.)

During a break in the interview, Petitioner stated to Detective Dillian while the two were alone, "[y]ou guys really think I did him, don't you?"  Dillian responded that the police were concerned because Petitioner had lied to them during the first interview and that they really did not know what to think.  Petitioner allegedly responded, "[i]f I shot him, it would ruin my entire life forever."  (Doc. 19, R/T 11/12/97 at 7-8.)

On January 9, 1996, acting on a hunch, the police seized the garbage container from the Bach residence.  On January 12, 1996, while the trash container was in police storage, Detective Dillian opened the lid and smelled "a very very strong odor of putrification."  Detective Dillian did not notice any odor when the lid was closed.  (Doc. 19, R/T 11/6/97 at 71-84, 110.)  Results of a blood analysis regarding blood from the outside of the garbage container were consistent with blood "from an offspring of Rhonda Michie."  (Doc. 19, R/T 11/5/97 at 113-15.)

In February 1996, Petitioner was living with his mother, Brittany Brown, in Las Vegas, Nevada.  On February 15, 1996, Detectives Lewis and Dillian met with Las Vegas

1   Police Detective David Hatch and served a physical evidence order on Petitioner.  Pursuant

2   to the order, blood and other forensic evidence was obtained from Petitioner.  (Doc. 19, R/T

3   10/30/97 at 5-6.)

4          On February 16, 1996, Petitioner's mother notified the Las Vegas Police Department

5   that she and Petitioner wished to speak with police about Brad's disappearance.  Detective

6   Hatch transported Petitioner and his mother to the detective bureau where Hatch interviewed

7   Petitioner.  The interview was tape-recorded and the recording was played for the jury at

8   trial.  Petitioner told Detective Hatch that he and Brad had been playing with his father's

9   guns at the residence on November 10, 1995, and that while Petitioner was holding the .357

10  magnum revolver something hit his hand, the weapon fired, and Brad was killed.  Petitioner

11  said that after Brad was shot, he cleaned up the blood and put Brad's body into the family

12  trash dumpster.  Petitioner said he took the shell out, put the slug in the cabinet, and threw

13  the casing away.  Petitioner denied he and Brad had been arguing.  Detective Hatch notified

14  the Phoenix detectives of the interview.  (Doc. 19, R/T 10/30/97 at 7-14; Doc. 18, Exh. 32.)

15         Later that evening, Petitioner telephoned Erica Stehle, the mother of one of his

16  Phoenix friends, and told her that he was in trouble with the law concerning "the Brad thing,"

17  that he had made a statement to the Las Vegas police, and that he was going to be charged

18  with "accidental murder."  Petitioner told Stehle that he and Brad had been playing with

19  guns, pointing them at each other, and that he had hit his hand on a table or counter and the

20  gun went off.  (Doc. 18, R/T 10/29/97 at 31-39.)

21         On February 17, 1996, Phoenix Police Detective Lewis interviewed Petitioner in Las

22  Vegas which was audio recorded.  The audio recording was played for the jury at trial.

23  Petitioner told Detective Lewis that on November 10, 1995, he and Brad were pointing the

24  guns at each other while they were unloaded and pulling the trigger.  After Petitioner

25  reloaded the .357 magnum and was holding it in his right hand at his hip, with the barrel

26  pointed down, he bumped his hand, causing him to "barely" pull the trigger, resulting in the

27  discharge of the uncocked gun, and Brad was shot in the chest.  Petitioner claimed that he

28  had his back to Brad, the gun was upside down when it fired, and "if the bullets curve or

1    something." Petitioner said the gun was not cocked because he did not know how to take it

2    back out. Petitioner said his finger was not holding the trigger but was in the trigger guard.

3    Petitioner said he pulled the bullet out of the wall with a butter knife while Taylor was at his

4    house on November 10 and that he told Taylor that Brad shot at him. Petitioner stated that

5    a while later someone came and stole Brad's bike. Detective Lewis told Petitioner that the

6    slug that had been provided to the police could not have been fired by the .357 magnum

7    revolver. Petitioner explained he had stored the bullet in a bag along with about 80 other

8    bullets he had collected from the desert and thought the police had been given the round fired

9    from the .357 magnum. (Doc. 19, R/T 11/12/97 at 22-32, 43-44; Doc. 18, Exh. 35A.)

10        Twenty-four police detectives searched the Butterfield Landfill every day for six

11    weeks searching for Brad's body. However, Brad's body was never recovered. (Doc. 19,

12    R/T 11/6/97 at 84-86.)

13        On February 16, 1996, Phoenix police officers searched the Bach residence and

14    recovered a loaded .357 magnum revolver and other items for blood tests, including a kitchen

15    chair, tile grout, and wall board from the kitchen. Officers identified in the kitchen wall what

16    appeared to be a "bullet strike" located "three feet ten inches up from the floor." It appeared

17    that the bullet had entered the wall board at an angle. The search of the Bach residence

18    produced a holster and a magazine clip for a .38 semiautomatic pistol. The search failed to

19    produce a bag containing bullets as described by Petitioner. (Doc. 19, R/T 11/5/97 at 51-109,

20    R/T 11/6/97 at 102-03, R/T 11/13/97 at 23.) An expert testified at trial that the .357 magnum

21    could only be discharged by pulling the trigger and that if uncocked, a trigger force of 10 and

22    1/4 pounds would be required to fire the weapon in double action mode. The expert testified

23    that the slug purportedly removed from the hole in the kitchen wall was a bullet coming out

24    of a .38 super cartridge that would be loaded into a semi-automatic pistol and fired from a

25    .38 semi-automatic pistol and could not have been fired from the .357 magnum revolver.

26    (Doc. 19, R/T 11/6/97 at 30-63.)

27        Maricopa County Chief Medical Examiner Phillip Keen, M.D., testified that he

28    observed a reddish brown fluid level stain in the Bach's garbage can and, if the stain was

1    blood, it was sufficient blood loss to account for loss of life without treatment and possible

2    loss of life with treatment.  Dr. Keen also testified that given a gunshot wound to the chest

3    and subsequent observation of foaming or frothing at the mouth, it is indicative that there is

4    most likely damage to one or more lungs.  Foaming at the mouth is possible around the time

5    of death and after death.  Dr. Keen testified that, a chest gunshot wound to a 70-pound young

6    male that goes slightly from counsel's right to the left as counsel looked at Dr. Keen, the

7    bullet could strike the right lung and/or associated major vascular structures, the cause of

8    death can occur within a couple of minutes to a maximum of ten minutes.  If it is venous, it

9    will be slower; if it is arterial it will be faster.  If the injury only involved the right lung and

10   vascular structures it might be survivable.  (Doc. 19, R/T 11/6/97 at 4-28.)

11            Daniel Bach testified at trial he had never owned a .38 semiautomatic pistol.  He

12   testified that on November 10, 1995, he owned a derringer .22 that he stored on a shelf in a

13   kitchen cabinet and a .357 magnum pistol that he stored in a couch cushion in the living

14   room.  Bach testified that he spoke with Ms. Michie on Sunday and learned that she was

15   looking for Brad.  He testified that he did not discover there had been damage to the kitchen

16   wall until the detectives were at the house on December 13 or 14, 1995.  (Doc. 18, R/T

17   10/29/97 at 70-81, 81.)  An employee testified that Daniel Bach was not seen at his place of

18   employment on November 10, 1995, until around noon or 12:30 p.m.  (Doc. 19, R/T

19   11/12/97 at 45-54.)  Another employee testified that she did not receive any calls from

20   Petitioner for his step-father on the morning of November 10, 1995.  (Doc. 19, R/T 11/13/97

21   at 44.)  On November 16, 1995, during a telephone conversation with Phoenix Police Officer

22   Johnny Chavez, Daniel Bach reported that he had spoken with Ms. Michie and assured her

23   that a gun had not been fired at his residence.  Bach told Officer Chavez that his guns were

24   locked up, there was no possibility anyone could have gotten one, and there was no hole in

25   the wall.  (Doc. 19, R/T 11/13/97 at 49-57.)

26   ///

27   ///

28   ///

- 11 -

**DISCUSSION**

As previously indicated, Respondent contends and Petitioner concedes that the habeas petition was not filed within the statute of limitations period.[1]  Petitioner, however, argues that pursuant to <u>Lee v. Lampert</u>, the one-year statute of limitations should be overridden by the fact that Petitioner is "actually innocent" of the offense for which he was convicted. Specifically, Petitioner asserts that he "needs no 'new' evidence to support his gateway actual-innocence claim" but alleges that he, nevertheless, meets his burden under <u>Schlup v. Delo</u>, 513 U.S. 298 (1995) – that "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence" – because the State did not present sufficient evidence at trial.  In the alternative, Petitioner claims that he has come forward with "new evidence" in the form of affidavits from two mental health professionals demonstrating that no reasonable juror would have found beyond a reasonable doubt that Petitioner would have consciously disregarded a grave or substantial risk that his conduct would cause Brad's death.  The Court finds, however, that not only has Petitioner failed to demonstrate diligence or that some extraordinary circumstances prevented him from filing a timely habeas petition, Petitioner's actual innocence claim fails on multiple grounds, including that: (A) the <u>Schlup</u> gateway is not satisfied by a mere insufficiency of the evidence claim; (B) the jury's verdict of second degree murder was supported by substantial evidence; and (C) the "new evidence" presented by Petitioner does not change that fact.

---

[1]  Indeed, as set forth in the record, Petitioner's judgment of conviction became final in 2000 when the time expired to file a petition for writ of certiorari after the Arizona Supreme Court denied review of Petitioner's direct appeal.  The statute of limitations was tolled, however, while Petitioner's first petition for post-conviction relief was pending.  The tolling stopped after the deadline passed for Petitioner to seek review of the denial of his first petition for post-conviction relief.  The statute of limitations began to run in September 2000 and ran, uninterrupted, until September 2001, when it expired.  His subsequent state petitions for post-conviction relief did not further toll the limitations period because it had already expired.  Accordingly, Petitioner's federal habeas petition, filed on September 15, 2009, was approximately 8 years too late.

The Ninth Circuit recognizes that the AEDPA's limitations period may be equitably tolled because it is a statute of limitations, not a jurisdictional bar.  See Calderon v. United States Dist. Ct. (Beeler), 128 F.3d 1283, 1288 (9th Cir. 1997), overruled in part on other grounds by Calderon v. United States Dist. Ct. (Kelly), 163 F.3d 530, 540 (9th Cir. 1998). Tolling is appropriate when "'extraordinary circumstances' beyond a [petitioner's] control make it impossible to file a petition on time."  Id.; see Miranda v. Castro, 292 F.3d 1063, 1066 (9th Cir. 2002) (stating that "the threshold necessary to trigger equitable tolling [under AEDPA] is very high, lest the exceptions swallow the rule") (citations omitted).  "When external forces, rather than a petitioner's lack of diligence, account for the failure to file a timely claim, equitable tolling of the statute of limitations may be appropriate."  Miles v. Prunty, 187 F.3d 1104, 1107 (9th Cir. 1999).  A petitioner seeking equitable tolling must establish two elements: "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way."  Holland v. Florida, 130 S.Ct. 2549, 2562-65 (2010); see Pace v. DiGuglielmo, 544 U.S. 408, 418-19 (2005).[2]  Petitioner must also establish a "causal connection" between the extraordinary circumstance and his failure to file a timely petition.  See Bryant v. Arizona Attorney General, 499 F.3d 1056, 1060 (9th Cir. 2007).

The circumstances in this case do not support a finding that Petitioner pursued his rights diligently or that extraordinary circumstances prevented him from filing a timely habeas petition.  As the record demonstrates, Petitioner had until September 2001, in which

---

[2]  In Lee, the Ninth Circuit did not foreclose the possibility that, to qualify for an "actual innocence" exception to the AEDPA statute of limitations, a petitioner must demonstrate that he acted "diligent[ly]."  See Lee, 653 F.3d at 934 n.9.  The Court stated, in pertinent part, "[b]ecause this case does not present the question, we need not – and do not – decide what diligence, if any, a petitioner must demonstrate in order to qualify for the actual innocence exception recognized in this opinion."  In reserving the issue, the en banc court compared the Tenth Circuit's decision in Lopez v. Trani, 628 F.3d 1228, 1231 (10th Cir. 2010) (requiring no showing of diligence) and the Eighth Circuit's decision in Flanders v. Graves, 299 F.3d 978, 978 (8th Cir. 2002) (requiring a petitioner to show either that a state-created barrier prevented his timely discovery of relevant facts or that a "reasonably diligent petitioner" could not have discovered such facts in time to file within the limitations period).

1   to file a timely petition for writ of habeas corpus with respect to his conviction or sentence,
2   unless the time was tolled by a "properly filed" application for state post conviction relief.
3   However, Petitioner did not even *attempt* to file his untimely second notice of post-
4   conviction relief until January 2006 – well over 4 years later.  And, by the time Petitioner
5   filed his Petition (September 15, 2009), he was already approximately *8 years past* the
6   deadline.  Petitioner appears to concede his lack of diligence and fails to proffer any reason
7   why it took him multiple years to come forward with (1) his alleged gateway claim of
8   insufficient evidence or (2) his alleged "new evidence" in the form of affidavits from two
9   mental health professionals – one of which interviewed Petitioner on two previous occasions
10  in 1997 and testified on Petitioner's behalf at the sentencing hearing.  Thus, the Court
11  concludes that this is not a case where Petitioner has been diligently pursuing his rights, and
12  Petitioner has not described any extraordinary circumstance which prevented him from filing
13  a timely habeas petition.

14       Despite the Court finding that Petitioner has not been diligently pursuing his rights,
15  Petitioner contends that the "actual innocence gateway" of Schlup v. Delo, applies to him
16  and, as such, the statute of limitations should not apply to his claims for habeas relief.

17       In Lee v. Lampert, the Ninth Circuit held that a credible showing of "actual
18  innocence" under Schlup, excuses the statute of limitations period established by the
19  AEDPA.  See 653 F.3d at 931.  "[A] petitioner who makes such a showing may pass through
20  the *Schlup* gateway and have his otherwise time-barred claims heard on the merits."  Id. at
21  932.  To pass through the Schlup gateway, a "petitioner must show that it is more likely than
22  not that no reasonable juror would have convicted him in the light of the new evidence."
23  Schlup, 513 U.S. at 327.  This standard "permits review only in the 'extraordinary' case, but
24  it 'does not require absolute certainty about the petitioner's guilt or innocence.'"  House v.
25  Bell, 547 U.S. 518, 538 (2006).  The "petitioner must produce sufficient proof of his actual
26  innocence to bring him 'within the narrow class of cases ... implicating a fundamental
27  miscarriage of justice.'"  Lee, 653 F.3d at 937 (quoting Schlup, 513 U.S. at 314-15).  "The
28  evidence of innocence must be 'so strong that a court cannot have confidence in the outcome

of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.'"  Id. (quoting Schlup, 513 U.S. at 316).  As noted in Lee, "*Schlup* requires a petitioner 'to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory, scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial.'"  Id. (quoting Schlup, 513 U.S. at 324).  The habeas court considers all the evidence, both old and new, incriminating and exculpatory, admissible at trial or not, and based on the complete record, "the court makes a probabilistic determination about what reasonable, properly instructed jurors would do."  Lee, 653 F.3d at 938 (internal quotations omitted).

### A.   Insufficiency of the Evidence Claim

Petitioner's habeas petition and Supplemental Brief proceed with the claim that the evidence presented at trial was "insufficient" under Jackson v. Virginia, 443 U.S. 307, 307 (1979) ("upon the record evidence adduced at trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt"), and thus that he "needs no 'new' evidence to support his gateway actual innocence claim."  The Court finds, however, that Petitioner is wrong, both on the law and the facts.  Petitioner's assertion that he need not present "new" evidence to successfully pass through Schlup's gateway is not only contrary to Schlup, it contradicts Lee's affirmation that, "to pass through the *Schlup* gateway, a petitioner *must show* that it is more likely than not that no reasonable juror would have convicted him *in light of the new evidence*."  Lee, 653 F.3d at 938 (emphasis added).  Lee specifically states:

> *Schlup requires* a petitioner "to support his allegations of constitutional error with *new reliable evidence* – whether it be exculpatory scientific physical evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial."

Id. (quoting Schlup) (emphasis added); see also id. at 945-46 (Kozinski, C.J., concurring).  As such, Petitioner cannot meet the gateway actual innocence standard by merely alleging that there was insufficient evidence presented at trial to support a finding of guilt.  Although Schlup's actual innocence gateway contemplates that the *new evidence* of innocence will be

viewed in light of the evidence presented at trial, it is not simply another vehicle for challenging the evidence produced at trial.

In any event, Petitioner's claim that the State presented "no evidence from which a reasonable factfinder would (or could) have [convicted him]," is unfounded.   As demonstrated in the following discussion, the State presented ample evidence in support of Petitioner's conviction.

**B.**     **Evidence Presented at Trial**

At trial, the State argued that Petitioner had satisfied the elements of second degree murder under A.R.S. § 13-1104(A)(3),[3] both by recklessly shooting Brad in the chest with a gun that he knew to be loaded, and by failing to summon aid for his dying friend.   The following constitutes the considerable evidence from which reasonable jurors found that Petitioner's conduct fell within the established elements of the offense:

1.     Petitioner admitted that he shot Brad in the chest with the .357 revolver, and that Petitioner knew that the gun was loaded.  (Exh. 35(A).)

2.     Because the trigger force needed to discharge the .357 when it was uncocked was over 10 pounds, it followed that, when Petitioner shot Brad, either the gun was cocked or Petitioner exerted over 10 pounds of force on the trigger (R/T 11/6/97 at 36-38), both of which were incompatible with Petitioner's claim that as Petitioner was walking away from Brad, "something bumped" Petitioner's hand, causing him to accidentally pull the trigger and fire backwards, striking Brad directly in the chest.  (Exh. 35(A).)

---

[3]   A.R.S. § 13-1104(A)(3) provides, in relevant part: "A person commits second degree murder if, without premeditation: ... (3) Under circumstances manifesting extreme indifference to human life, the defendant recklessly engaged in conduct which created a grave risk of death and thereby caused the death of another person ... ."   A.R.S. § 13-105(9)(c) defines "recklessly" stating "that a person is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur and the circumstance exists.  The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation."

3.     Although Petitioner's disposal of Brad's body prevented a determination of how long Brad survived after the shot, at a minimum, the evidence demonstrates that he was still alive and continued to struggle for breath:

- "I saw him ... heaving. ... He was just moving his chest up and down." (Exh. 35(A) at 4.)

- "And then he started gargling ... this spit ... bubbles of spit." (Id.)

- "I turned him over and there was a big old puddle of blood under him. ... And I didn't know what to do. What to do with him. *He was sitting there for like at least an hour and a half. Cause I didn't know what to do*." (Id.) (emphasis added).

- "I was just sitting there thinking. And I was like, put him in the trash can. Cause I couldn't think of nothing. I was thinking about calling my dad and telling him but, I think it'd be like too stressful." (Id.)

- "[T]hen I saw his eyes open still. ... I thought he was messing around until I saw ... some kind of the spit come out of his mouth[.] He was like jerking his chest like ... . That. (Id. at 18.)

- "He was, he's was like trying to breathe." (Id.)

- "I don't know what he was doing but he like moving his chest up and down. He was moving. ... That's all I know. I, I saw him moving. And I saw his mouth open. He was like ... foam was coming out." (Id. at 20.)

- "[H]e was still breathing and all. I was like pushing right here. Trying to get him up. ... His eyes were wide open." (Id. at 21.)

- "I know he was breathing cause when he moved a piece of his heart came out." (Id. at 22.)

4.     Nevertheless, rather than call 911 or summon help, Petitioner began cleaning up the scene and disposing of the evidence. (Id. at 5, 20-25.)

5.     At the time Petitioner finally put Brad in the trash dumpster (at least an hour and a half after shooting him), Petitioner claimed that Brad had "stopped moving" and his eyes had closed. (Id. at 23-24.) However, Petitioner was still uncertain enough about whether Brad was actually dead that he left the top of the trash container open for an hour, "just in case, ... he'd like get up and walk out." (Id. at 25.)

6.     In addition to disposing of Brad's body, Petitioner took numerous steps to conceal what he had done, including:

- Taking a "shell case" out of the .357 and throwing it in the "trash." (Id. at 22, 28.)

- Replacing the .357 "under the couch," and taking the "little twenty-two" out of Brad's hand, and putting it back in his stepfather's case. (Id. at 4, 8, 18.)

- Digging the bullet out of the wall and putting it in a "big old bag" of bullets. (Id. at 4, 22, 34.)

- Cleaning up "all that blood."[4] (Id. at 5, 20.)

- Washing his own clothes and shoes to get the blood off. (Id. at 5, 20.)

- Throwing Brad's back pack away.[5] (Id. at 6.)

7.      In the hours and weeks that followed, Petitioner repeatedly lied to Brad's mother, the Police, school officials, and Petitioner's friends to prevent the discovery of Brad's death and his role therein. For example, Petitioner:

- Failed to return Brad's mother's "pages" to Brad on the day of the murder, because "she woulda asked ... where he was ... and everything would get all messed up."

- Lied to his friend Taylor, who arrived after Petitioner finished cleaning up most of the evidence of the killing, by telling her that Brad had left after getting into a fight with him.

- Lied again to Taylor, when she noticed some blood, telling her that Brad had hit him in the face with a chair.

- Lied again to Taylor, when she noticed the bullet hole in the wall, telling her that Brad had fired one of the guns at him.

---

[4] According to record, cleaning up the blood was a major task, which took about two hours. (Exh. 35(A) at 24-26.) To accomplish this, Petitioner picked Brad up and "put him ... away from the blood." Then after cleaning it up, Petitioner put a large "garbage bag" under Brad and "moved him again," and cleaned up the remaining blood. (Id. at 22.)

[5] As Petitioner admitted, the purpose of the concealment was to avoid arrest:

At first I thought I was gonna call my dad and tell him. But then I like thought what would happen ... to me. Then I ... thought I was like gonna go bury it and I said no. ... I couldn't do that. I thought I was gonna call one of my friends to bring his truck down[,] and go bury him or something. I couldn't do that. Cause then they would know I killed him and they'd go tell the cops and I'd get arrested really quick. So I just did that.

(Exh. 35(A) at 23.)

- Lied to Brad's mother when she telephoned, telling her that Brad had left Petitioner's house earlier that day.

- Lied to the maids who noticed blood in the kitchen and dining room while cleaning up the Bach residence on the afternoon of the killing, by telling them that he had gotten into a fight at school.

- Lied to a school official on the following Monday (November 13, 1995) when asked about Brad's disappearance, telling the official that Brad had come over on Friday, that they became involved in a physical confrontation in which Brad had hit Petitioner with a bar stool, and that Brad had left.

- Lied to the Police and a school official on December 5, 1995, by telling them that, on November 10, Petitioner and Brad had gotten into a fight, Brad had beat him up and thrown a butter knife at him, and left to go home.

- Lied to the Police on December 14, 1995, telling them that no shooting had occurred at the house.

- Lied to his stepfather and the Police the following day, to account for the bullet hole in the wall, by claiming that Brad had fired a gun.

(R/T 10/28/97 at 62-76, 86; R/T 10/29/97 at 6-21, 82-83; R/T 10/30/97 at 81-87; R/T 11/5/97 at 3-32, 38-50; R/T 11/6/97 at 93-98, 113; R/T 11/12/97 at 9-10; R/T 11/13/97 at 7-9; Exh. 35(A).)

8.    Petitioner did not actually admit to shooting Brad until the Phoenix Police Detectives arrived in Las Vegas with a court order that permitted them to take samples of Petitioner's blood and bodily fluids (R/T 10/30/97 at 5-7). Even then, after having had the opportunity to think about it overnight, Petitioner's version of how Brad was shot was inherently unlikely. For example:

- Contrary to what Petitioner had told Taylor, the Police, and school officials, Petitioner claimed that he and Brad had not gotten into a fight and were not arguing, but rather were simply "playing" and "messing around" with the weapons (Exh. 32 at 3; Exh. 35(A) at 3), which they had unloaded. (Exh. 35(A) at 9.)

- Although Petitioner eventually admitted that the boys were pulling the triggers while pointing the empty guns at each other, (id. at 9-10), Petitioner claimed that he had only pulled his trigger "at" Brad "once or twice." (Id.) And then added – "At his feet." (Id.)

- When Petitioner shot Brad, Petitioner claimed that he was no longer playing with the .357, but rather was in the process of putting the gun away.

- 19 -

According to Petitioner, Brad was behind Petitioner,[6] and Petitioner hit his hand on "something," which caused him to pull the trigger, and the gun discharged behind Petitioner ("upside down").[7] (Id. at 3, 5, 9, 11-13, 38-39.)

Despite the evidence presented at trial, Petitioner argues that, "although there certainly was some risk that reloading and carrying the .357 handgun a very short distance to put it back in its hiding place would lead to Brad Hansen's death," that risk was "very small," and there was "[n]othing in the circumstances that culminated in the accidental firing of the weapon manifested the sort of extreme indifference to human life that is required by A.R.S. § 13-1104(A)(3)."[8]   The Court finds, however, that Petitioner's argument fails in several respects:

---

[6] While Petitioner claimed that he had his back to Brad when the gun went off, he was able to state: "When it hit him he flew back.  Hit the wall."  (Exh. 35(A) at 10-11, 13, 15.) Later, Petitioner claimed, "I didn't even see him hit the wall cause I turned away."  (Id. at 17.)

[7] Petitioner gave a variety of explanations for what caused him to pull the trigger, including: (i) "Something bumped me and I pulled the trigger.  I thought he hit it with his hand or something" (Exh. 35(A) at 3); (ii) "[Brad] musta hit it with his leg or something. Cause it just went off" (Id. at 11); (iii) "I think I like hit [the table] and it fired off.  Cause I don't think he touched me.  Cause he was like, he was pretty far behind me" (Id. at 12); (iv) "I have no idea [what I bumped into]. ... I felt something hit my hand like hard.  It musta been the little table piece.  The little draw piece off the cabinets?  The bread cabinets underneath" (Id. at 13); (v) "It musta been the table chair" (Id. at 14); (vi) "I hit something hard.  Like something metal." (Id. at 41); (vii) "[I]t hit a table or something.  Cause, I didn't pull the trigger on purpose.  I didn't like point it at him and pull the trigger.  I know that's what it sounds like, you know.  Like stood at 'em and pulled the trigger or something."  (Id.)

[8] In support of his version of events Petitioner characterizes Detective Hatch, the Las Vegas Detective who initially interviewed Petitioner, as "conclud[ing]" that "'it was just two boys playing with guns and one of the guns went off.'"  (Doc. 1 at 21, quoting R/T 10/30/97 at 19.)  However, the precise statement to which Detective Hatch agreed, was: "But Jeremy throughout the interview insisted that it had nothing to do with that.  It was just two boys playing with guns and one of the guns went off."  (R/T 10/30/97 at 19.)  Thus, all Detective Hatch agreed to was that Petitioner "insisted" that "it was just two boys playing with guns and one of the guns went off," not that Detective Hatch accepted Petitioner's version of events.

1    First, among the numerous improbabilities and inconsistencies in Petitioner's version

2    of events was his claim that, at the time he pulled the trigger, the gun was not cocked, and

3    that he "barely" pulled the trigger, and just "touched" it.   (Exh. 35(A) at 15-16, 37.)

4    Petitioner's claim is inconsistent with the undisputed evidence that the force necessary to

5    discharge the uncocked weapon was over 10 pounds.  (R/T 11/6/97 at 36-38.)  Thus, either

6    Petitioner had the loaded gun cocked at the time he shot Brad, or Petitioner put over 10

7    pounds of force on the trigger.  See Wright v. West, 505 U.S. 277, 296 (1992) ("As the trier

8    of fact, the jury was entitled to disbelieve [defendant's] uncorroborated and confused

9    testimony. ... And if the jury did disbelieve [the defendant's trial testimony] it was further

10   entitled to consider whatever it concluded to be perjured testimony as affirmative evidence

11   of guilt[.]"); United States v. Henderson, 409 F.3d 1293, 1301 (11th Cir. 2005) ("[A]

12   defendant's implausible explanation may constitute positive evidence in support of a jury

13   verdict.") (quoting United States v. Bennett, 848 F.2d 1134, 1139 (11th Cir. 1988)); United

14   States v. Burgos, 94 F.3d 849, 868 (4th Cir. 1996) ("Observing that juries take account of

15   incredible tales, [the] Bennett [court] explained that '[a] reasonable jury might well

16   disbelieve the explanation and conclude that the [defendants] were lying in an attempt to

17   cover up illegal activities.'").

18   Second, Petitioner's concealment of the evidence and repeated lies were likewise

19   relevant to how reasonable jurors could view the sufficiency of the evidence because,

20   consistent with Arizona law, the jurors were instructed that "concealing evidence after a

21   crime has been committed does not itself prove guilt, [but] [y]ou may consider any evidence

22   of defendant's concealment together with all other evidence."  (R/T 11/13/97 at 137); see

23   State v. Bible, 858 P.2d 1152, 1195 (Ariz. 1993) (affirming foregoing instruction, stating:

24   "Evidence of flight from, or concealment of, a crime usually constitutes an admission by

25   conduct."); State v. Cutright, 2 P.3d 657, 659 (Ariz. Ct. App. 1999), overruled on other

26   grounds by State v. Miranda, 22 P.3d 506 (Ariz. 2001).

27   Given Petitioner's documented history of lying about the incident, and the evidence

28   concerning the force necessary to fire the weapon uncocked, a reasonable fact-finder would

be warranted in rejecting Petitioner's unlikely contention that "something" accidentally bumped his hand after he had stopped "playing" with the gun, and instead concluding that, at the time Brad was shot in the chest, either: (i) the gun was cocked or Petitioner was deliberately attempting to pull the trigger; and/or (ii) Petitioner had (in play or otherwise) deliberately pointed the loaded gun at Brad.  Indeed, based solely on the location of the wound and Petitioner's subsequent conduct, Petitioner cannot establish that no reasonable fact-finder could conclude that Petitioner was guilty of second degree murder.  See State v. Whittle, 752 P.2d 494, 497 (Ariz. 1988) ("The use of a deadly weapon, the nature of the fatal wound, the concealment of the body, and flight are factors which suggest the defendant in firing the gun intended to kill the victim, but the factors also support the conclusion, absent any other explanation, that in the use of the lethal weapon the defendant showed an extreme indifference to human life.").[9]

Third, Petitioner's concealment of evidence – in particular, his disposal of Brad's body in the garbage dump – is likewise relevant to rebut Petitioner's alternative claim that "no reasonable trier of fact could ... have found beyond a reasonable doubt" that Petitioner's "failure to summon aid" after shooting Brad "caused" Brad's death.  (Doc. 1 at 26.) Although Petitioner emphasizes his statements to the police that he thought, "[o]h shit I killed him," and that Brad "moved his chest like four times and then stopped," (Doc. 1 at 14, 27; Exh. 35(A) at 40), Petitioner's statement hardly confirms the time of Brad's death.  In fact,

---

[9]  Although Petitioner concedes that the evidence presented by the State "arguably would have been sufficient to support a conviction of negligent homicide," he maintains that, to allow his conduct to support a verdict for second degree murder "would be to negate the significant distinctions between negligent homicide, manslaughter, and reckless second degree murder." (Doc. 1 at 21-23.)  The record, however, demonstrates that the jurors were in fact presented with each of these lesser options, and the trial court carefully instructed the jury as to each. (R/T 11/13/07 at 137-40.)  Moreover, under Schlup, the question is not whether a reasonable juror would have been entitled to vote for a lesser-included offense, it is whether the defendant has come forward with "new evidence" and can demonstrate that "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." See Schlup, 513 U.S. at 327.

1  Petitioner's four-breath argument is undermined by his own testimony indicating that Brad
2  survived much longer.

3      For example, despite Petitioner's admission that Brad "flew back and hit the wall"
4  when the gun fired, Petitioner incredibly claimed that he thought Brad was playing around,
5  and did not turn him over until after Petitioner had replaced the spent bullet in the.357, put
6  the gun back under the couch, and taken the smaller gun out of Brad's hand and returned it
7  to its hiding place.  (Exh. 35(A) at 3-4, 11, 13, 18, 20.)  Even then, Petitioner admitted that
8  Brad's eyes were still open, and he was still "moving his chest up and down."  (Id. at 4, 18,
9  20.)  And, after Petitioner turned Brad over and saw the "puddle of blood under him,"
10 Petitioner moved Brad against the wall, and left him "sitting there for like at least an hour
11 and [a] half," while Petitioner cleaned up the blood and thought about what to do next.  (Id.
12 at 4-5, 21-23.)  When explaining why he did not call for help, not once did Petitioner state
13 – because I thought Brad was already dead.  Rather, he said, "I panicked," "I was thinking
14 about calling my dad and telling him but, I [thought] it'd be like too stressful," "I like thought
15 what would happen," "I was too nervous to," "I have no idea," "I wasn't even thinking about
16 calling for help," and "I was thinking about what would happen."  (Id. at 4, 23, 40.)

17     Petitioner contends that his failure to call for help – despite the seriousness of Brad's
18 wound and Petitioner's claim that Brad's chest had stopped moving – was "perhaps"
19 negligence, but no more.  (Doc. 1 at 27.)  The fact-finder, however, was entitled to conclude
20 that these very facts drastically *increased* the need for immediate action, and that Petitioner's
21 failure to call 911 in the face of such a dire emergency that he himself caused, fell squarely
22 within the definition of criminal recklessness.  See A.R.S. § 13-105(9)©).

23     Furthermore, Petitioner's suggestion that the testimony of the medical examiner (Dr.
24 Keen) "confirmed" Petitioner's purported belief that Brad died shortly after being shot, (Doc.
25 1 at 27), is incorrect.  Petitioner states that Dr. Keen testified that, if Brad was shot in "the
26 chest," he would have died "within 'maybe a couple of minutes to maybe up to five or ten
27 minutes max.'" (Doc. 1 at 15.)  Dr. Keen testified, however, that assuming a gunshot wound

28

"between the breasts of a 70 pound young male," there are a "range of possibilities" of the

organs that may be struck, depending on the location and angle of the shot:

> If it is a straight through shot, you may catch just the very medial borders of either lung, usually the right.  You could get the heart.  You could get the aorta, you could strike the trachea, or esophagus, depending upon slightly how much or down we're going.  Then you can also get neurologic items with damage to the spinal court and spinal column.  There are a range of objects that could be theoretically within the path of a wound striking mid chest.

(R/T 11/6/97 at 14.)

It was only when asked about a hypothetical angle that would strike "one of the major

vascular structures associated with the lung"[10] that Dr. Keen responded, "if you strike one

of the major vascular structures," a person could die anywhere from "maybe a couple of

minutes to maybe up to five or ten minutes max." (Id. at 15-16.)  However, Dr. Keen also

testified:

> Given the limitations on our hypothetical, we don't know precisely what is struck.  We will have to again assume maybe what we just described is in fact the path.  And if that is the case, if we have struck just those kinds of organs, yes lung, or major vessels, you do need relatively prompt – and prompt is minutes response time to do something.

(Id. at 16.)  Further, when asked on redirect examination whether a wound to the "right lung

and vascular structures" might be a "survivable injury," Dr. Keen responded that it would be

"potentially survivable," if treatment were secured "promptly":

> It is potentially survivable.  Again, we don't know what was struck, but it is possible to have a survivable injury that turns fatal.  All you have to do is – that if the angle is deep enough, that it misses the main pulmonary artery and does damage to the lung.

(Id. at 26.)

---

[10]  When asked about the "foaming of the mouth" described by Petitioner, Dr. Keen testified, "[f]oaming of the mouth" after a gunshot wound to the chest is indicative of a "reflex action coming from the GI track of the stomach. Or lung. Most commonly, from the lung." (R/T 11/6/07 at 10-11.)  To get the foaming, "you still have action of either breathing or circulation most often."  (Id. at 13.)  "So it's possible to have the foaming "ante mortem" (before death), "perimortem" (about the time of death), and "post-mortem" (after death). (Id. at 13-14.)

1  Dr. Keen never testified that, "if Brad was shot in the chest, he would have died

2  within 'maybe a couple of minutes to maybe up to five or ten minutes max.'" (Doc. 1 at 15.)

3  He stated that, if the bullet struck one of the "major vascular structures associated with the

4  lung," death could occur in that time frame.  (R/T 11/6/97 at 15-16.)

5  Regardless, the fact remains, there is no question that Brad continued to survive for

6  some period of time after Petitioner shot him.  Nevertheless, despite the fact that Brad was

7  in obvious and serious need of medical assistance, Petitioner began concealing evidence

8  rather than call for help.

9  In sum, even if access through <u>Schlup</u>'s actual innocence gateway could be based

10  solely on claims of alleged insufficiency of evidence at trial, the State presented the jury with

11  ample evidence from which reasonable jurors could conclude that Petitioner, "[u]nder

12  circumstances manifesting extreme indifference to human life, ... recklessly engage[d] in

13  conduct that create[d] a grave risk of death and thereby cause[d] the death of [Brad Hansen],"

14  both by shooting Brad in the chest with a .357 magnum revolver, and by failing to summon

15  aid.  <u>See</u> A.R.S. § 13-1104.

16  **C.     Petitioner's "New Evidence"**

17  The "new evidence" proffered by Petitioner in support of his passage through the

18  <u>Schlup</u> "actual innocence" gateway proceeds on a different theory – that given his age and

19  other factors, Petitioner would have been incapable of satisfying the "criminal recklessness"

20  element of second degree murder.  In support of this theory, Petitioner offers the affidavits

21  of a psychologist and a psychiatrist, both of whom opine on Petitioner's ability to have

22  "consciously disregarded" the "grave risk(s)" of death accompanying his conduct.

23  Specifically, the 2006 affidavit of psychologist, Susan Downs Parrish, Ph.D., who met

24  and interviewed Petitioner on two previous occasions in 1997 and testified on Petitioner's

25  behalf at the sentencing hearing, states in pertinent part,

26      [Petitioner] *probably* would not have been aware of, and *probably* would not
have consciously disregarded, a grave risk that (i) taking [Petitioner's]

27      stepfather's guns from their hiding places and unloading them; (ii) playing
with the unloaded guns; and/or (iii) reloading the guns to place them back in

28      their hiding places would result in Brad Hansen's death[; and]

1    [Petitioner] *probably* would not have been aware of, and *probably* would not
2    have consciously disregarded, a grave risk that his failure to summon aid after
     Brad Hansen was shot would result in Brad Hansen's death.

3    (Doc. 1, Exh. 6 at ¶11) (emphasis added).

4        The 2006 affidavit of psychiatrist, Mark Wellek, M.D., who does not claim to have

5    ever met Petitioner, omits the word "probably" from his testimony, and states that Petitioner

6    would have been incapable of acting with criminal recklessness (due to the dominance of the

7    "Amygdala's functions" and "non-functional" Pre-Frontal Cortex), and that a reasonable

8    juror would have had "no basis" for concluding otherwise.  (Doc. 1, Exh. 5 at ¶5.)

9        Initially, the Court notes that affidavits alone are not a promising way to demonstrate

10   actual innocence.  Though sworn, affidavits are not convincing evidence of innocence

11   because "the affiants' statements are obtained without the benefit of cross-examination and

12   an opportunity to make credibility determinations."  Herrera v. Collins, 506 U.S. 390, 417

13   (1993).  In addition to the inherent weakness of an affidavit, the affidavits at issue are

14   particularly unhelpful in that the opinion of Dr. Parrish – the only affiant who appears to

15   have actually tested and interviewed Petitioner – is hardly unequivocal.  And, in arguing that

16   "his Amygdala controlled his behavior during the obviously stressful events in question,"

17   Petitioner relies on the subjective view of Dr. Wellek, who appears to have never met

18   Petitioner as an adult – let alone when he was a juvenile.  Further, the strength of both

19   affidavits are further diluted considering that: (1) During the Las Vegas police interviews,

20   Petitioner himself admitted that pointing a loaded gun at someone would be "stupid" (Exh.

21   35(A) at 9), thus demonstrating Petitioner's consciousness of the grave risks associated with

22   handling a loaded weapon; and (2) The affiants do not appear to have been provided with a

23   copy of the entire trial record, but instead were given Petitioner's Las Vegas police

24   interviews, and a seemingly one-sided summary of the trial presumably prepared by

25   Petitioner, which accepted Petitioner's statements that Brad's death was the result of an

26
27
28

"accident" occurring after Petitioner and Brad had been "playing" with "unloaded" guns, when Petitioner was returning the .357 to its hiding place.  (Doc. 1, Exhs. 5, 6).[11]

The fact that *8 years* after his conviction, Petitioner can find two mental health professionals to take such positions on behalf of a juvenile tried as an adult simply fails to compel the conclusion that, "it is more likely than not that no reasonable juror would have convicted [Petitioner] in light of the new evidence." Schlup, 513 U.S. at 327.  This is particularly true when one considers the strength of the evidence of record, the fact that the jurors who convicted Petitioner were themselves fit to view Petitioner's actions in the context of a 13-year-old child, and that the trial court had specifically instructed all jurors that, in determining the "degree of recklessness or negligent conduct," Petitioner was not to be treated as an adult, but rather: "is held to the same standard of care that is ordinarily exercised by children of the same age, intelligence, knowledge and experience under the existing circumstances."  (R/T 11/13/97 at 140.)  Petitioner's trial lawyers not only repeatedly directed the jury to Petitioner's age, but argued that Petitioner's version of his conduct – that he accidentally bumped the gun as he was returning it to its hiding place – when viewed through the eyes of "children of the same age and intelligence, knowledge and experience," simply did not rise to the level of second degree murder – "the highest standard of recklessness."  (R/T 11/13/97 at 114-117.)

The Court finds that Petitioner's "new evidence" does not approach the "extraordinary" showing contemplated by Schlup.  Accordingly, Petitioner is not entitled to equitable tolling and cannot pass through the Schlup actual innocence gateway.  His habeas petition is, therefore, untimely.

---

[11] The "Brief Summary" of the 8-day trial that Petitioner provided to the affiants was advocative in other respects, including its failure to inform the affiants about Petitioner's multiple lies to cover up his role in Brad's killing, its misleading recounting of Dr. Keen and Detective Hatch's testimony, and its attempt to downplay the significance of the fact that the .357 revolver had a 10-pound trigger pull.

**CONCLUSION**

Having determined that Petitioner's habeas petition is untimely, the Court will recommend that Petitioner's Petition for Writ of Habeas Corpus (Doc. 1) be denied and dismissed with prejudice.

**IT IS THEREFORE RECOMMENDED** that Petitioner's Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) be **DENIED** and **DISMISSED WITH PREJUDICE**;

**IT IS FURTHER RECOMMENDED** that a Certificate of Appealability and leave to proceed *in forma pauperis* on appeal be **DENIED** because the dismissal of the Petition is justified by a plain procedural bar and jurists of reason would not find the procedural ruling debatable.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment.  The parties shall have ten days from the date of service of a copy of this recommendation within which to file specific written objections with the Court.  See 28 U.S.C. § 636(b)(1); Rules 72, 6(a), 6(b), Federal Rules of Civil Procedure.  Thereafter, the parties have ten days within which to file a response to the objections.  Failure timely to file objections to the Magistrate Judge's Report and Recommendation may result in the acceptance of the Report and Recommendation by the district court without further review.  See United States v. Reyna-Tapia, 328 F.3d 1114, 1121 (9th Cir. 2003).  Failure timely to file objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation.  See Rule 72, Federal Rules of Civil Procedure.

DATED this 7th day of August, 2012.

*Michelle H. Burns*

Michelle H. Burns
United States Magistrate Judge